IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** )<br>)<br>)<br>v.     )<br>)<br>)<br>**WOODROW RUDOLPH DIXON** )<br>et al., Defendants.     )<br>) | No. 1:12-CR-205-ODE-ECS |

### WOODROW DIXON'S POST-HEARING BRIEF ON MOTIONS TO SUPPRESS

Woodrow Dixon stands accused, in a superseding indictment, of participation in a Hobbs Act conspiracy, related weapons offenses, and conspiracy to possess cocaine. He respectfully submits this Post-Hearing Brief in support of his pretrial motions, both of which, the Government agrees, he has standing to argue (T. 136).

### STATEMENT OF FACTS

At a September 12, 2012 evidentiary hearing, continued on March 11, 2013, four ATF agents testified about the events surrounding Mr. Dixon's arrest. The arrest was accomplished without incident on June 26, five days

after agents took Mr. Dixon's codefendants into custody. Along with a motion for a *Bruton* severance, which the Court has deferred [Doc. 58] , Mr. Dixon has moved to suppress the statement he made shortly after his arrest [Doc. 57] and the data extracted from the Samsung telephone he was using at the time agents approached him [Doc. 99].[1]

*Arrest and Questioning*

Coincidentally the grand jury was hearing evidence in this case on June 26, and Agent Spence Burnett was at the federal courthouse testifying that morning before he got word that Mr. Dixon had been located (T. 148-152).[2] Burnett arrived to find Mr. Dixon already in custody. Agents had converged on him just after he walked out of a building in southwest Atlanta, accompanied by his son, and got into his car (T. 64, 116-117, 154).

---

[1] The motion to suppress evidence addressed three mobile phones, one of which was in Mr. Dixon's pocket, the other in his car. The motion challenged the seizure of the phone from the car, citing *Arizona v. Gant*, 556 U.S. 332 (2009), and sought suppression of the data extracted from all three phones. Because the Government has advised the Court and counsel that it will seek to admit only the data that was extracted from the Samsung phone and from an SD card that was removed from that phone (T. 136), this Brief will not discuss the *Gant* issue or the other phones.

[2] A warrant for Mr. Dixon's arrest issued when the indictment was voted; item 49 on the docket is that warrant, stamped received on the day of the arrest at 3:47 pm. Fortener and Burnett both testified, however, that Mr. Dixon was taken into custody on the authority of an arrest warrant that was signed in relation to the complaint on June 22 (T. 37-38, 121, 148-152).

Agent Michael Fortener estimated that it was then about 12:20 pm (T. 51).

Mr. Dixon's car was released to his son, and he was driven a short distance to the Atlanta Police Department's Zone 4 office (T. 65, 70-71). There, during a session they could have recorded, but chose not to (T. 66-67), Fortener and Burnett interrogated him after reading him his rights and securing a written *Miranda* waiver (T. 39-44).

A Report of Investigation prepared by Burnett indicates that Mr. Dixon declined to answer certain questions at three points during the interview, but that the agents continued questioning him each time he declined (Govt. Exh. 7). Burnett testified that Dixon asked, before the interview began, whether he could refuse to answer some questions while answering others (T. 124). Then, during the questioning, Mr. Dixon refused to answer questions about "hitting licks" and twice refused to respond to queries about his knowledge that a stash house had been under surveillance.

Fortener recalled that "every time we asked a question specific to our -- the criminal part of our investigation, he didn't want to answer that particular question" (T. 48). Burnett testified that when Mr. Dixon would

choose not to answer a specific question, he and Fortener "would have stopped on that particular question" (T. 125). He admitted that he couldn't recall who was the first person to speak each time after Mr. Dixon would decline to answer a question, and further admitted that he neither re-Mirandized his subject nor asked for clarification of his intent or his understanding of his rights, on the three occasions when Dixon exercised his right to remain silent (T. 125-127).

The interrogation ended after he declined to answer questions a fourth time and invoked his right to counsel (T. 49). Almost three months later at the evidentiary hearing, Fortener estimated that the interview ended around 3:15 or 3:30 pm (T. 51), but the Report of Investigation, which was prepared and approved six days after the incident, indicates that questioning began at around 12:40 pm and ended around 2:45 (Govt. Exh. 7). Fortener and Burnett left the Atlanta Pretrial Detention Center, after Mr. Dixon had been booked into the facility, around 4:00. *Id.*; *see* T. 51.

### *Seizure of Data from Mobile Phone and SD Card*

While the agents had an arrest warrant for Mr. Dixon, and while they

had information that he had used mobile phones to commit the charged offenses, they never secured a search warrant for his phones or any other belongings. They had a "tactical decision" to make about whether to seek a search warrant, Burnett said, and they hadn't decided at the time of the arrest (T. 152-153).

ATF Agent Daniel Arrugueta, a trained and experienced forensic examiner, told the court that he extracted data from the Samsung phone Mr. Dixon had been holding at the time of his arrest and from an SD card that he removed from the Samsung. He confirmed that no search warrant existed to authorize the search and seizure of the data (T. 156-157, 160-161, 167, 172).

Arrugueta was present at Mr. Dixon's arrest and picked the Samsung up off the top of his car, where he left it upon being taken into custody (T. 159-161). By this time Mr. Dixon had been secured, and though he was prompted on redirect to acknowledge that cellphones can pose dangers of alerting criminal associates or even detonating other devices, Arrugueta said he had no reason to believe the phone itself posed any danger (T. 166, 183). He drove to HIDTA headquarters where he consecutively searched

the devices, using a cellebrite (one-way writer) device for the phone itself and separate software for the SD card that he removed from the phone (T. 162-163, 167-168). Then he left the devices, and the discs where he had copied the data, on Agent Burnett's desk (T. 164).

Arrugueta explained his understanding of the applicable law (T. 172):

> Based on my training and experience, a phone or a device of that type is a container of information. I can go through the container contemporaneously with the arrest as long as -- my end parameter as far as time goes is the end of the booking process.

At the hearing, he couldn't tell the court how long it took him to extract data from the phone and memory card (T. 162, 171). The ride from the arrest site to the HIDTA office took about twenty minutes (T. 163). Arrugueta began his work immediately upon arriving there, but he testified that he conducted a physical inspection of the devices before he harvested any data (T. 170). He said it might have taken an hour or so to perform the data "dump"; he made a more thorough examination of the SD card than of the phone, and that probably took about half an hour (T. 168-169). And he made it clear that he was in contact with Burnett while

his work was in progress (T. 164):

> These phones I was extracting as far as I knew incident to arrest, so I called Spence to see where they were in the process and to ensure that he was -- that Mr. Dixon was either still in the booking process or where they were to see -- to make sure that my search was still within the parameters of the incident to arrest.
>
> Q.   And that it was timely?
>
> A.   Yes.
>
> Q.   And what did Agent Burnett advise you as far as the status of Mr. Dixon at that point?
>
> A.   He stated he was still in their custody, that he had not been fully booked in because they were still involved in an interview.

Concerning the substance of his work, Agent Arrugueta testified that the several available methods of data extraction vary in the depths of the searches they can perform.  Sometimes, he said, it's possible to recover even data that the user has deleted from his or her phone.  This can occur when one reaches the most basic level of code in the phone's software; he did not use an extraction method capable of going that far on the Samsung phone, but did use such a method on the SD card (T. 158-159, 168-169).  He noted that persons more familiar with the case than he had made the

decision to have a forensic analysis of the phones performed (T. 184). And when asked whether he followed an agency policy outlining when a warrant should be secured before searching a phone, he insisted that the only policy he knew of was that he had to stay within the law (T. 179-180).

Finally, Arrugueta testified that it is sometimes possible to "wipe" a mobile device's data from a remote location. He had no particularized concern about that happening to the Samsung phone he was analyzing, however, and he admitted he took no steps to determine whether that device was even configured to allow remote deletion (T. 171-172). Absent a remote "wipe," he said, there was no reason to believe that the secured, switched-off Samsung phone would be in danger of losing its data (T. 185).

## ARGUMENT AND CITATIONS OF AUTHORITY

1. **The Portion of Mr. Dixon's Post-Arrest Statement That Followed His Alleged Refusal to Answer Specific Questions Must Be Suppressed**

Mr. Dixon contends that Agents Fortener and Burnett failed to honor his constitutional right to remain silent after he decided, at three points

during the course of his interrogation, not to answer specific questions about alleged criminal activity. Agent Burnett testified that he could not recall who first spoke after Mr. Dixon exercised his right to silence. Especially because the agents continued questioning him each time he demonstrated a desire not to talk, there is an impermissibly high risk that any waiver of that right Mr. Dixon may have effected when the conversation continued was involuntary, requiring suppression of any subsequent statements.[3]

Mr. Dixon, however, acknowledges the holding of *United States v. Mikell*, 102 F.3d 470, 477 (11th Cir. 1996), *cert. denied sub nom. Young v. United States*, 520 U.S. 1181 (1997), that "a suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that

---

[3]This is primarily a Fifth Amendment concern. On the facts of this case, in which an indictment was filed very close in time to Mr. Dixon's interrogation, the Court should assume that his right to counsel had attached as well. *See Rothgery v. Gillespie County*, 554 U.S. 191, 198 (2008) (right to counsel attaches, *inter alia*, at time of indictment). This point is probably academic, however, since the right we contend Mr. Dixon invoked was the right to remain silent, not the right to counsel; and in any event the Supreme Court has endorsed waivers of both rights upon a showing that the accused understood and knowingly surrendered them. *See generally Montejo v. Louisiana*, 556 U.S. 778 (2009).

he wishes the questioning to cease." *See also Owen v. Florida Dep't. of Corrections*, 686 F.3d 1181, 1194 (11th Cir. 2012), *cert. pending* (U.S. No. 12-8439) (applying rule). He respectfully preserves his claim for suppression of his statement in the face of this contrary authority.

**2.     The Data Extracted from Mr. Dixon's Samsung Phone and its SD Card Must Be Suppressed Because the Devices Should Have Been Examined Pursuant to a Search Warrant**

Despite having watched and recorded Mr. Dixon for months, and despite having a warrant in hand for his arrest, the ATF agents working this case took no steps to secure a search warrant for his cellphone or its components. At the suppression hearing they sought to characterize Agent Arrugueta's data extraction as occurring incident to the arrest. But he performed his forensic work miles from the arrest site, and he was concerned not with neutralizing danger or preventing the imminent loss of evidence but with whether the formalities of booking Mr. Dixon into jail had been completed. The theory of search incident to arrest fits poorly with the facts before the Court, and since neither it nor any other exception to the warrant requirement applies to the highly intrusive searches Arrugueta conducted, the fruits of his work must be suppressed at trial.

"Whether the warrantless search of a cell phone incident to arrest violates a person's Fourth Amendment expectation of privacy is an unanswered question in this Circuit." *United States v. Allen*, 416 Fed. Appx. 21, 27 (11th Cir. 2011); *see Mehta v. Foskey*, 2013 WL 870325 (S.D. Ga. March 7, 2013) (noting that question remains open). Where warrantless searches of cellphones have been sustained, however, courts have tended to invoke the theory of search incident to arrest. The leading case is *United States v. Finley*, 477 F.3d 250 (5th Cir.), *cert. denied*, 549 U.S. 1353 (2007). There the defendant had given a ride to an associate who was selling methamphetamine. Police conducted a traffic stop, took Finley's cellphone out of his pocket, and viewed its call and text logs, finding messages that were suggestive of other drug transactions. 477 F.3d at 254.

The Fifth Circuit held that both the seizure of the phone and the viewing of its contents were lawful. As to the former, the court, citing *United States v. Robinson*, 414 U.S. 218, 223-224 (1973) and *New York v. Belton*, 453 U.S. 454 (1981), as well as Circuit authority, said that "[t]he permissible scope of a search incident to a lawful arrest extends to containers found on the arrestee's person." 477 F.3d at 260. As to the

-11-

latter, the court simply repeated that the phone had been taken incident to Finley's arrest and, without further analysis, declared the examination of its contents to have been lawful. *Id.* And in a footnote, the court stated:

> The fact that the search took place after the police transported Finley to [the codefendant's home, site of a warrant search] does not alter our conclusion. . . . *In general, as long as the administrative processes incident to the arrest and custody have not been completed, a search of effects seized from the defendant's person is still incident to the defendant's arrest. United States v. Ruigomez*, 702 F.2d 61, 66 (5th Cir.1983) (citing [*United States v.*] *Edwards*, 415 U.S. [800,] 804 [1974]). Although the police had moved Finley, the search was still substantially contemporaneous with his arrest and was therefore permissible.

*Id.* at 260 n.7 (emphasis added).

This latter passage is likely the source of Agent Arrugueta's belief that his forensic examination was proper as long as Mr. Dixon's booking had not been completed; it is, in any event, a clear and concise statement of the bright-line rule that he applied.

It is perhaps useful to make Mr. Dixon's argument for suppression by outlining the reasons that *Finley* is not controlling despite Agent Arrugueta's reliance on it. The first reason is, quite simply, that *Finley* predates *Arizona v. Gant*, 556 U.S. 332 (2009), which significantly restricted

the permissible scope of a search incident to arrest. The *Finley* court was able to speak sweepingly, and without much analysis, about the authority agents possessed to search an accused's area and possessions when, as in this case, the seizure of his person was itself lawful. *Gant*, however, later held that searches incident to arrest are proper only when they are extensive enough to quell security concerns or when it is reasonable to believe that evidence of the offense of arrest will be found. 556 U.S. at 351.

*Gant* elevates the importance of the agents' admissions that Mr. Dixon had been secured when the phone was seized and that there was no particularized concern about imminent data loss once Arrugueta had the device in hand. It also makes relevant a significant distinction from *Finley*: the defendant in the Fifth Circuit case was detained pursuant to a traffic stop immediately after participating in a drug transaction, 477 F.3d at 254, whereas there was nothing in this case to suggest that Mr. Dixon had anything on his person or in his car that was relevant to the Hobbs Act and other offenses of which he stands accused.[4]

---

[4] If, as Agent Burnette claimed, he had developed through investigation reason to believe that Mr. Dixon had used a mobile phone to commit crimes, that fact would militate against, rather than in favor of, a search of the phone without a warrant.

It is true that searches incident to arrest have been considered proper when they extended to "personal property immediately associated with the person" being arrested. *United States v. Chadwick*, 433 U.S. 1, 15 (1977). This rule flows from the *Robinson* case cited in *Finley*, but it underserves legitimate privacy interests where modern cellphones are concerned. They can contain (and in this case, did contain) a wealth of information including call records, text messages on personal topics, and private photographs; in this sense they resemble the footlocker for which the Supreme Court held a search warrant must be obtained, in *Chadwick*, much more than the cigarette pack that was seized from the defendant's pocket in *Robinson.* Cellphones – which are at once libraries and communications centers and entertainment devices and personal diaries – should not be rummaged through by government agents as an incident to an arrest, because of the fortuity that they are carried on the person.

Finally, Arrugueta's practice of continuing his forensic work as long as the booking process continues speaks of a rule that is at once too rigid and too arbitrary. "[W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest

-14-

either if the "search is remote in time or place from the arrest . . . ." *Chadwick*, 433 U.S. at 15 (citation omitted), and these spatial and temporal factors ought not to be removed from the search-incident calculus lest the doctrine become a license for unrestricted rummaging through personal effects.  When one considers that booking processes will vary tremendously across cases based on countless unknown factors, and also that, as may have happened here, the booking process can be manipulated or extended while a statement is being obtained or other investigative measures taken, the unreasonableness of tethering an intrusive forensic search to the time taken up by jailhouse procedures is abundantly obvious.

      Respectfully submitted this 3rd day of April, 2013.

                                       /s/ Stephen R. Scarborough
                                       STEPHEN R. SCARBOROUGH
                                       Georgia Bar Number 628351
                                       Counsel for Mr. Dixon

The Candler Building
127 Peachtree Street, Suite 905
Atlanta, GA 30303
(404) 523-2044
(404) 921-9683 fax
srsdefender@gmail.com

## CERTIFICATE OF SERVICE

I certify that on April 3, 2013, I electronically filed the accompanying **WOODROW DIXON'S POST-HEARING BRIEF ON MOTIONS TO SUPPRESS** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

/s/ Stephen R. Scarborough
STEPHEN R. SCARBOROUGH
Georgia Bar No. 628351
Attorney for Mr. Dixon

The Candler Building
127 Peachtree Street, Suite 905
Atlanta, GA 30303
404.523.2044
404.921.9683 fax
srsdefender@gmail.com