IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA      :
                              :    CRIMINAL ACTION
          v.                  :
                              :    No. 1:12-CR-205-ODE-ECS
                              :
WOODROW RUDOLPH DIXON, JR.,   :
KIRK FLOYD,                   :
                              :
          Defendants.         :

## REPORT AND RECOMMENDATION
## OF THE MAGISTRATE JUDGE

### I.
### Introduction

This matter is before the court on the following motions brought on behalf of Defendant Dixon: motion to suppress statements [Doc. 57], and motion to suppress evidence seized from a mobile telephone [Doc. 87], supplemented at [Doc. 99]. A hearing was held on these motions on September 12, 2012, and March 11, 2013. Also pending for decision are the following motions filed on behalf of Defendant Floyd: motion to suppress post arrest statements [Doc.79], and motion to suppress evidence seized from a cell phone [Doc. 92]. A hearing was held on Floyd's motion to suppress statements on September 12, 2012. The government announced at the hearing on March 11, 2013, that it would not seek to introduce any evidence

from Mr. Floyd's cell phone, thus rendering his motion at [Doc. 92] **MOOT**. [T. 136-37].[1]

With respect to the motion to suppress statements filed by Defendant Dixon, [Doc. 57], Defendant contends that, while Defendant initially waived his Miranda rights, he later withdrew his waiver by declining to answer certain questions during the interview. The government responded to the motion by pointing to 11th Circuit authority that the government contends is dispositive of Defendant Dixon's motion to suppress statements. See [Doc. 143 at 10].

With regard to Defendant Floyd's motion to suppress statements, [Doc. 79], Floyd submits that his statement made at the Strike Force offices after his arrest on June 21, 2012, must be suppressed because his Miranda waiver was not knowing and intelligent as a result of his having been under medication after having been shot in the head with a "super sock" at the time of his arrest. See [Doc. 141 at 4-5]. The government responds that the evidence does not support a finding that Defendant's Miranda waiver was not voluntary and knowing. [Doc. 143 at 11-14].

---

[1] References to the hearings will be made "[T. -]". The second hearing on March 11, 2013, is treated as a continuation and paginated as volume two of the hearings.

## II.
## The Evidentiary Hearings

A. The September 12, 2012, Evidentiary Hearing

At the evidentiary hearing on September 12, 2012, Agent Michael Fortener of the Bureau of Alcohol, Tobacco and Firearms ("BATF"), one of the co-case agents for the case, testified. He first testified regarding the arrest of Defendant Floyd. The arrest was made approximately 3:30 in the afternoon on June 21, 2012. [T. 26]. At the time of the arrest, Defendant Floyd exited a Suburban vehicle and "took off." [T. 29]. At that point, he was shot in the back of the head with a "less lethal rounds" called a "Super Sock" fired from a 12 gauge shotgun and was knocked to the ground. [T. 29]. First aid was administered and Defendant Floyd was taken by ambulance to Grady Hospital. An ATF agent, Damon Cavender, was with him in the ambulance.

Defendant Dixon was arrested on June 26, 2012, pursuant to a warrant. [T. 36-37]. Mr. Dixon was taken to an interview room at the Atlanta Police Department Fourth Precinct where he was interviewed by Agent Fortener and Agent Spence Burnett. [T. 39]. The interview was not recorded. No threats or promises were made. Defendant was under arrest and advised of his rights. [T. 40]. He signed a waiver and agreed to talk. [T. 42]. He was "remarkably calm." [T. 43]. At certain points during the interview, Defendant

3

declined to answer specific questions. [T. 46-47]. This occurred two to three times. [T. 68]. In none of these instances did Defendant say that he wanted to end the interview, nor did he ask for a lawyer. [T. 46-48]. At some point, however, he asked for a lawyer. [T. 49]. The agents terminated the interview at that point. [T. 49-50]. The interview lasted approximately one and a half hours. [T. 51]. He was asked no further questions after he requested an attorney. [T. 51-52].

BATF Agent Damon Cavender also testified. He rode in the ambulance with Defendant Floyd to Grady Hospital. Floyd's head was in a bandage. [T. 82-83]. Cavender testified that initially Floyd was incoherent, mumbling, at the scene. [T. 84]. But then he appeared to improve. He began talking, asking questions during the ride in the ambulance. [T. 84-85]. No medication was administered during the ambulance trip. [T. 109]. He was handcuffed to a gurney when they arrived at the hospital. [T. 84-85]. During the ride to the hospital and at the hospital, Cavender did not ask Floyd any questions related to the case. [T. 86]. The government also stipulated that it would not seek to introduce any statements made by Floyd at the scene of arrest where first aid was being administered. [T. 86-87].

Defendant was given an MRI and the doctors indicated that they found no internal bleeding or damage. [T. 87]. Defendant was given

4

a shot of morphine and staples were used to close a laceration in the back of his head. [T. 87-88]. Defendant arrived around 4 or 4:30 in the afternoon at Grady and departed at approximately 6:50 in the evening. [T. 88]. The morphine injection was administered at 5:00 PM. [T. 89]. After they departed the hospital, Agent Cavender took Defendant to the Chick Fil-A to eat. [T. 92, 113]. It appeared to Agent Cavender that Defendant Floyd continued to get better the entire time he was at the hospital. [T. 91-92].

When they arrived at the Strike Force offices, Defendant Floyd was taken straight to the interview room. [T. 95, 113]. There, he was advised of his rights. [T. 96]. He signed a waiver of his rights. [T. 97]. No threats or promises were made to induce him to waive his rights and he agreed to talk. [T. 99-100]. The interview lasted two (2) to two (2) and a half hours and was not recorded. [T. 115]. Defendant did not take any medicine with him from the hospital and received no medication during the interview. [T. 117]. During the interview, he did not ask that it be terminated and he did not ask for a lawyer. [T. 101-102]. Defendant did not appear to be impaired. [T. 118].

Agent Spence Burnett also testified. Agent Burnett participated in the arrest of Defendant Dixon on June 26, 2012, and his questioning in the afternoon. [T. 121]. Burnett was not aware that an indictment had been presented prior to the arrest. [T. 121].

5

Dixon was arrested on an arrest warrant based upon a complaint. [T. 121]. Before he was interviewed, Dixon signed a <u>Miranda</u> waiver form. [T. 124]. He agreed to speak but he asked if he could decline to answer any specific questions, any one specific question. [T. 124]. He was told that he could decline to answer any particular question "if there's something you don't want to say." [T. 124].  Indeed, Dixon thereafter said he preferred not to answer three particular questions. [T. 125-126].  As soon as Dixon said he thought his attorney should be present, the agents stopped the questioning. [T. 127].

B. <u>The March 11, 2013 Evidentiary Hearing</u>

The supplemental hearing on March 11, 2013, addressed the circumstances of the seizure of Dixon's cell phone at the time of his arrest. It was stipulated that the only phone at issue on this motion is the Samsung cell phone that Dixon was in the act of using when he was encountered and arrested on June 26, 2012.  It was also stipulated that the government would not be seeking to introduce any evidence against Defendant Floyd relating to his cell phone seizure, thus mooting Floyd's motions at [Docs. 72, 92]. <u>See</u> [T. 135].

Agent Spence Burnett testified again. He testified that he was the affiant on the complaint. [T. 148]. He was relying on the arrest warrant issued on the basis of the complaint when he arrested Dixon. [T. 152].  He confirmed that Dixon was arrested as he exited a

6

building and was handcuffed and secured at that time. [T. 155]. On cross examination, Agent Burnett testified that he had information from the investigation that Mr. Dixon had used telephones in connection with the commission of the offense for which he was arrested. [T. 152].

Agent Daniel Arrugueta testified that he extracted the data from the Samsung cell phone that was seized from Mr. Dixon, both the phone itself and the micro SD Card in the phone. [T. 159, 169]. He is trained in extracting evidence as a "Computer Examiner". [T. 157]. He was present when Dixon was arrested and the phone was seized. [T. 159-60]. Dixon was starting to get into his car when he was arrested. [T. 160]. He was ordered to put his hands on the car. His phone was in his hands. [T. 160]. The phone was taken and put on top of the car. [T. 160]. Agent Arrugueta seized the phone off of the car roof and took the phone back to the law enforcement offices. [T. 161]. He used a device called "Cellebrite" which plugs into the phone to extract the data from the phone. [T. 163]. During this time, Agent Arrugueta called Agent Spence to be sure that the process of booking Mr. Dixon was still ongoing so that the search would be "within the parameters of incident to arrest." [T. 164]. He was advised that Dixon was still being booked. [T. 164]. He burned CDs of the information extracted from the phone. [T. 164].

AO 72A
(Rev.8/82)

Agent Arrugueta had no concern that the device was dangerous at all. [T. 166]. But there is always concern that data might disappear by virtue of a "remote wipe." [T. 171]. Typically, the first thing Agent Arrugueta does is turn the phone off and take out the battery. [T. 167]. These actions eliminate the possibility that the phone could be wiped remotely. [T. 185]. Agent Arrugueta did not do a "full dump" on the phone at the office because the process can take hours. [T. 169]. He would usually get a warrant if that were needed. But he did extract data from the SD card which took about 30 minutes. [T. 169]. Agent Arrugueta considered the cell phone a "container" that he could go through as long as it was done within the booking process. [T. 172].

### III.
### Mr. Floyd's Motion to Suppress "Super Sock" Statement

Defendant argues that the Miranda waiver he gave before his interview at the Strike Force offices was invalid. He submits that he did not have full awareness of the nature of the rights he was giving up as a result of the injury he received, the morphine shot at the hospital, and the staples put in the back of his head. He contends the government failed to meet its burden of showing that the waiver was knowingly and voluntarily entered and that the statements were voluntary. [Doc. 141 at 4-6].

8

Under Miranda, before questioning a suspect in custody, law enforcement must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney during questioning, and that, if he cannot afford an attorney, one will be appointed for him. Miranda, 384 U.S. at 467-73. Miranda rights may be waived, however, id. at 475; and, even if Miranda warnings are given, evidence that is coerced must be excluded. Colorado v. Connelly, 479 U.S. 157, 167 (1986) (dictum). In general, the government must prove that the defendant voluntarily, knowingly, and intelligently waived his or her Miranda rights. Miranda, 384 U.S. at 475.

"The inquiry [into waiver] has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The government bears the burden of proving waiver at least by a preponderance of the evidence. Missouri v. Seibert, 542 U.S. 600, 609 n.1 (2004); Connelly, 479 U.S. at 168.

To determine the validity of a Miranda waiver, the Court looks to the totality of the circumstances. Burbine, 475 U.S. at 421;

9

United States v. Beckles, 365 F.3d 832, 840 (11th Cir. 2009). Factors considered include the defendant's intelligence and education, Moore v. Dugger, 856 F.2d 129, 134-35 (11th Cir. 1988); familiarity with the criminal justice system, United States v. Street, 472 F.3d 1298, 1310-1312 (11th Cir. 2006); age, Coleman v. Singletary, 30 F.3d 1420, 1426 (11th Cir. 1994); physical and mental condition, United States v. Paredes, 139 F.3d 840, 844 (11th Cir. 1998); and drug and alcohol problems, Grayson v. Thompson, 257 F.3d 1194, 1230 (11th Cir. 2001).

In this case, the evidence does not support a finding that Defendant's waiver of his Miranda rights was unknowing, unintelligent, or involuntary. Although Mr. Floyd suffered a head injury from the Super Sock, the evidence does not indicate he was actually knocked unconscious, though he was stunned. See [T. 103]. And though he did seem stunned and confused, "a little incoherent," and mumbled immediately after he was downed by the shot and arrested, the testimony was that he quickly recovered during the twenty to thirty minute ambulance ride, [T. 84]; was asking questions about the charges and what was going to happen to him, [T. 85]; was able to speak lucidly and clearly, [T. 85]; and his eyes were no longer glazed. [T. 85].

Defendant arrived at the hospital about 4:30 p.m.; he was treated, given an MRI, and administered a shot of morphine at about

10

five o'clock.  It did not appear to the doctors, according to the agent, that he had any internal bleeding or internal damage to his head. [T. 87]; see also Gov't. Ex 3.  The back of his head was stitched up using staples, and at 6:50 p.m., about two and a half hours after he arrived at the hospital, he was discharged. [T. 88]. He continued to get better the entire time he was at the hospital, and he walked out of the hospital on his own. [T. 91-92, 94].  The agent then took him to Chick Fil-A for dinner and then on to the Strike Force offices where he was interviewed. [T. 92-93].

When they got to the interview room, Mr. Floyd was advised of his rights.  The agents read his rights to him, [T. 98]; he acknowledged that he understood them, and he signed the form. [T. 98-99]; see also Gov't. Ex. 4.  He also agreed to speak with the officers. [T. 100].  This was about 7:41 p.m., some two hours and forty-five minutes after the morphine shot.  During the interview, Agent Cavender did not observe any sign that Mr. Floyd was confused, weary, or tired; he did not ask for a lawyer or to end the interview. [T. 102]. In short, none of the evidence indicated that Mr. Floyd was not able to understand his rights and sign a valid waiver.  Mr. Floyd did not himself testify, so there was no evidence to contradict Agent Cavender's observations.

Accordingly, based on the totality of the circumstances, I conclude that Mr. Floyd knowingly, intelligently, and voluntarily

waived his rights and agreed to speak to the agents.  There is no evidence his statements were coerced or involuntary.  His motion to suppress on this basis, [Doc. 79], should, therefore, be **DENIED**.

### IV.
### Mr. Dixon's Motions

A. The Motion to Suppress Post-Arrest Statements.

Defendant Dixon argues that the portions of his post-arrest statement that followed his refusal to answer certain questions should be suppressed.  He equates his election not to answer certain specific questions with the invocation of his right to remain silent and not answer *any* more questions. In response, the government points to Eleventh Circuit authority to the contrary seemingly on point.  See [Doc. 143 at 10].  Defendant acknowledges the same contrary authority.  See [Doc. 134 at 9].

Indeed, the Circuit Court addressed the issue presented here in United States v. Mikell, 102 F.3d 470, 476-77 (11th Cir. 1996):

> The Supreme Court has held that, when a person is undergoing a custodial interrogation and he indicates in any manner, at any time prior, to or during questioning, that he wishes to remain silent, the interrogation must stop. Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627-28. Before the Supreme Court's decision in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), this court had held that, when a defendant makes an equivocal request for an attorney during a custodial interrogation, the scope of interrogation is immediately narrowed to clarifying that request. Coleman v. Singletary, 30 F.3d 1420, 1423-24 (11th Cir.1994). The same rule applied to equivocal invocations of the right to terminate questioning. Id.

12

The Supreme Court's decision in Davis, however, changed this 'clarification only' rule. In Davis, the Court held that a defendant must articulate his desire to have counsel present with sufficient clarity so that a reasonable police officer under the circumstances would understand the statement to be a request for an attorney. 512 U.S. at ----, 114 S.Ct. at 2355. 'If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.' Id. at ----, 114 S.Ct. at 2356. In light of this ruling, we have also determined that a suspect must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent. Coleman, 30 F.3d at 1424. If the statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation. Id.

In this case, as in Mikell, it is undisputed that, after Dixon was read his Miranda rights, he was informed by the interrogating officers that he could decline to answer any particular question if there was something he did not want to say. [T. 124]. At no time during the interrogation did Dixon indicate that he wanted the questioning to cease, at least not until he said he thought he needed an attorney, at which time the questioning stopped and the interview was terminated. [T. 49, 51, 127]. Prior to that time, on three occasions, he simply stated that he did not want to talk about certain matters or answer certain questions. [T. 47, 68-69]. In response, the officers redirected their questioning. [T. 47].

The Court in Mikell held "that a suspect's refusal to answer certain questions is not tantamount to the invocation, either

13

equivocal or unequivocal, of the constitutional right to remain silent and that questioning may continue until the suspect articulates in some manner that he wishes the questioning to cease." Id. at 477.   The Court noted that, "[a]fter a knowing and voluntary waiver of Miranda rights, law enforcement officers may continue questioning 'until and unless the suspect clearly requests' that the questioning cease. Id. (citing Davis, 512 U.S. at ----, 114 S.Ct. at 2356).   In this case, as in Mikell, Dixon did not clearly request that the questioning stop until he expressed the need for an attorney, when the interview was in fact terminated.   Based upon these facts and the above authority, Dixon's motion to suppress his post-arrest statements made after his refusal to answer specific questions should be **DENIED**.

B. The Motion to Suppress Search of the Cell Phone

The undersigned will address this motion [Doc. 87, 99], in a separate Report and Recommendation to be filed within thirty days.

**V.**
**Conclusion**

In conclusion, the undersigned **RECOMMENDS** that Mr. Floyd's motion to suppress statements [Doc. 79] be **DENIED** and that Mr. Floyd's motion to suppress cell phone evidence [Doc. 92] be **DENIED** as **MOOT**. As for Mr. Dixon's motions, I recommend that his motion to suppress post-arrest statements [Doc. 57] be **DENIED**. The undersigned

14

will issue a separate **REPORT AND RECOMMENDATION** within thirty days with regard to Mr. Dixon's motion to suppress evidence from a cell phone. [Docs. 87, 99].

      **SO REPORTED AND RECOMMENDED**, this 29th day of July, 2013.

_s/ E. Clayton Scofield III_
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

15