IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Action Nos. |
| *v.* | 1:12-CR-205-ODE |
| WOODROW RUDOLPH DIXON, A/K/A/ DRO, KIRK L. FLOYD, A/K/A TWIN, | |

### Sentencing Memorandum

The United States of America, by Sally Quillian Yates, United States Attorney, and Mary L. Webb, Assistant United States Attorney for the Northern District of Georgia, files this Sentencing Memorandum

## 1. Procedural History

On November 25, 2014, a federal jury convicted defendants Woodrow Rudolph Dixon, a/k/a Dro, and Kirk L. Floyd, a/k/a Twin, of participating in a conspiracy to commit an armed robbery of a cocaine stash house in the Northern District of Georgia. Specifically, the jury convicted Dixon of the following counts contained in the Superseding Indictment: Count One, conspiring to violate the Hobbs Act, in violation of 18 U.S.C. § 1951(a); Count Two, possessing or carrying a firearm, including a shotgun with a barrel length of less than 18 inches, in connection with a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(B)(i); and Count Three, conspiring to distribute over five kilograms

of a mixture or substance containing cocaine, in violation of 21 U.S.C. § 846.  Doc. 209.  The jury convicted Floyd of those same three counts, and additionally convicted Floyd of possessing a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).  Doc. 209.

The Court originally scheduled sentencing for both defendants for February 26, 2014.  Docs. 229 and 230.  The sentencing has been continued four times, and is currently scheduled for July 17, 2014 at 11:00.[1]  The final Pre-Sentence Investigation Reports for Dixon and Floyd were prepared on March 5, 2014.  The final Pre-Sentence Investigation Report holds each of Dixon and Floyd responsible for conspiring to distribute 25 kilograms of cocaine.  Each of defendants Dixon and Floyd has objected to this quantity of cocaine in the Pre-Sentence Investigation Report, and this is an unresolved Guidelines issue for each.  Furthermore, defendant Dixon has notified the Court and the government via email that he intends to argue at the sentencing hearing that the Court should find that that the government engaged in "sentencing entrapment" and "sentencing factor manipulation" as to the quantity of cocaine involved in the 21 U.S.C. § 846 offense.  Accordingly, the government now files this Sentencing Memorandum to address the inapplicability of both the "sentencing entrapment" and "sentencing factor manipulation" doctrines to both Dixon and Floyd.

---

[1] Co-defendant Cornelius Bernard Wilson, a/k/a Dog-man, entered a guilty plea to an Information on December 3, 2013, in case number 1:13-CR-476.  He is also scheduled to be sentenced on July 17, 2014 at 11:00 am.  Co-defendant Krisdeon D. Slack previously pled guilty to the original Indictment, and the Count sentenced him on January 16, 2013.  Doc. 118.

**2. Factual Summary**

**A. The initiation of the investigation.**

Defendant Woodrow Dixon came to the attention of federal law enforcement when a confidential informant, Brian Guyton, informed a federal agent that Dixon wanted to sell five kilograms of cocaine. Tr. at 18. A task force officer for the Drug Enforcement Agency started an undercover operation in which he pretended to be a drug dealer named "Tony" who would buy the cocaine from Dixon. Tr. at 22-23. Guyton was to facilitate the drug deal by introducing "Tony" and Dixon. "Tony," Guyton, and Dixon met on January 12, 2012 at the Chili's on Camp Creek Parkway in the Atlanta, Georgia area. Tr. at 19. At that meeting, Dixon agreed to sell "Tony" five kilograms of cocaine that Dixon represented was going to be arriving within the next couple of weeks from California. Tr. at 24. Dixon did not get the five kilograms delivered in a timely fashion, so approximately three weeks later, "Tony" had Guyton let Dixon know that he was no longer interested in purchasing the cocaine from Dixon. Tr. at 26. Approximately a week after "Tony" called off the drug deal with Dixon, Guyton contacted "Tony" again to let him know that Dixon had suggested robbing "Tony." Tr. at 26-27. Guyton testified at trial that he was shocked at Dixon's suggestion, because during the undercover operation with "Tony," Guyton had represented to Dixon that Guyton and "Tony" were close. Tr. at 74-75. But when Guyton expressed surprise at Dixon's suggestion, Dixon explained to Guyton that robbing people was his real occupation, and that he had a crew to carry out the robberies. Tr. at 75. In fact, Dixon told Guyton that Dixon had previously

3

robbed a man named Glenn Cook, who was the source for the five kilograms of cocaine that Dixon had attempted to sell to "Tony."  Tr. at 74-76.

Guyton made a recording of a conversation with Dixon that occurred on April 4, 2012, excerpts of which were played at trial.  In that recording, Dixon explained to Guyton how he would carry out robbing "Tony," and how he had carried out his previous robberies, including the one of Glenn Cook.  Tr. at 79-87; Gov. Ex. 5A.  Indeed, Dixon explained to Guyton that before he carried out a robbery, he liked to "do a lot of study . . . ." because he was very "calculated" in how he carried out his robberies.  Gov. Ex. 5A at 1.  While Guyton told Dixon during the April 4 conversation that he could lead Dixon to where "Tony" kept his money during the robbery, Dixon raised the point that perhaps they would be able to steal both money and cocaine from "Tony" during the robbery.  *See* Gov. Ex. 5A at 2 (Dixon stating that there could be "dope possibly" at the money house they were planning to rob).  Dixon also explained that he would have the robbery crew wear police uniforms, Gov. Ex. 5A at 3, and that Dixon would make up fake search warrant paperwork for the robbery to make the robbery victim more compliant, Gov. Ex. 5A at 8-9.  Dixon stated that he had robbed Glenn Cook, and he explained why he had robbed Cook.  Gov. Ex. 5A at 10-11. And Dixon expressed his willingness to use violence if necessary during the robbery, stating that the crew he would bring for the robbery were not "standby" types, but were "ride or die" types, Gov. Ex. 5A at 13, and that if the guard at the stash house started to "bust" anybody, "he's dead then."  Gov. Ex. 5A at 14.

At that point, "Tony," at the direction of his supervisor, turned the case over to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), because ATF had a special group that had experience investigating robbery crews. Tr. at 27.  After the ATF took over the investigation, the ATF case agents had Guyton introduce Dixon to an undercover ATF agent named "Shawn."  "Shawn" played a disgruntled drug courier for "Tony" who was willing to show Dixon where "Tony's" stash house was in exchange for a cut of the cocaine that Dixon and his crew would steal from it.  Tr. at 297.  Dixon had three meetings with "Shawn" in which they discussed robbing "Tony."

## B.  Dixon's meetings with undercover agents to plan the robbery.

The first meeting occurred on May 24, 2012 at a QuickTrip gas station off Camp Creek Parkway in Atlanta.  Tr. at 283.  "Shawn" recorded that meeting.  *Id.*  During that meeting, Guyton introduced "Shawn" to Dixon.  "Shawn" explained to Dixon the work he did for "Tony" of running a load of cocaine about once a month.  Gov. Ex. 16A at 6.  "Shawn" told Dixon that when he picked up cocaine monthly from "Tony's" stash house, there were "25 blocks of Mexican cocaine" in the house.  Gov. Ex. 16A at 7.  "Shawn" explained at trial that "block" is a slang word for a kilogram of cocaine, Tr. at 289, and that "Mexican cocaine" indicates that the cocaine will be directly from the Mexican suppliers, and thus will be a purer form that has not yet been cut, Tr. at 291.  "Shawn" also explained at trial that the amount of cocaine he told Dixon would be in the house was based on research into how much cocaine a stash house in the Atlanta area would be likely to have.  Tr. at 290.  At trial, Task Force Officer David Noe, with

5

the Drug Enforcement Agency, also testified that the range of cocaine that could be in a stash house in the Atlanta, Georgia area is between five and 300 kilograms.  Tr. at 351.

During this meeting, "Shawn" also told Dixon that he had never participated in anything like a robbery before, and that if Dixon did not want to participate, there would be no hard feelings.  Gov. Ex. 16A at 8-9.  But Dixon did not back out of the robbery; instead, he reassured "Shawn" that it was "all good."  Gov. Ex. 16A at 9.  Dixon also suggested to "Shawn" that the robbery crew could come dressed as the police, and that he had access to police dogs for the robbery.  Gov. Ex. 16A at 15.  And Dixon reassured "Shawn" that he could make sure "Shawn" never got caught by "Tony" for participating in the robbery.  Gov. Ex. 16A at 17. At the end of the meeting, when "Shawn" offered for Dixon to take time to put the robbery to his crew to see what they thought about it, Dixon responded "We don't have to think," and "We ready," and "We can do it this month . . . You ain't have to worry about [inaudible].  I can get my team ready.  We could have white vans, police lights and we can get the police dog."  Gov.  Ex. 16A at 28-29.[2]

"Shawn" and Dixon next met on June 11, 2012 at a Wendy's restaurant on Camp Creek Parkway in Atlanta, Georgia.  Tr. at 302.  Guyton also attended this

---

[2] Notably, Dixon's statements regarding being dressed as the police and having a police dog were not mere idle boasts.  At trial, the government presented the police gear that Dixon had provided for the crew to wear during the robbery.  And at trial, co-defendant Slack testified that co-defendant Wilson had a trained narcotics dog that Dixon intended to use on robberies.  Tr. at 431-432.  However, there was no dog at the robbery because co-defendant Wilson had sold the dog.  Tr. at 440.

meeting, and "Shawn" brought a second undercover agent, "Toby" with him. During this meeting, Dixon again discussed robbing "Tony."  As the men discussed the robbery, Dixon laid out "three scenarios" for the men of different ways to carry out the robbery.  Gov. Ex. 17A at 3-4.  As the men discussed the plan, "Shawn" told Dixon that he could "guarantee" that there would be 25 kilograms of cocaine in the house, but that he did not want to promise more than that amount and then have Dixon be disappointed if there were only 25 kilograms.  Gov. Ex. 17A at 4.  Dixon responded that his bottom line was that if there were more than 20 kilograms of cocaine, and the men were able to get in and out of the house, then "we straight."  Gov. Ex. 17A at 5.   And Dixon emphasized the experience of his robbery crew and his ability to control them, stating "I got a team . . . . if it's my show, it's my show . . . I'm gonna tell them what to do, I'm not gonna lead them into no bad situation and they not gonna turn it into a worse situation.  People I run with, I been running with.  If I say, run it, they gonna run it.  You see what I'm saying? " Gov. Ex. 17A at 8.

Finally, "Shawn," Guyton, "Toby," and Dixon met again on June 18, 2012, and this time Dixon brought Floyd with him.  Tr. at 310.  The robbery was explicitly discussed during the meeting.  *Id.*  Neither Dixon nor Floyd expressed any hesitation about the robbery.  Tr. at 311.  During that meeting, Floyd asked the group how many kilograms of cocaine would be at the stash house on the day of the robbery, and "Shawn" responded that there would be at least 25 kilograms of cocaine at the robbery.  Tr. at 311-312.

**C. The day of the planned robbery.**

On the planned day of the robbery, June 21, Dixon was out of town doing a photo shoot.  Tr. at 488.  Floyd had previously called co-defendant Slack and recruited him to come to the robbery.  Tr. at 432.  Floyd provided the pre-robbery meeting location, directing the members of the robbing crew to meet at a store called Floyd's Plaza.  Tr. at 433.  The men gathered at Floyd's Plaza were Guyton (the confidential informant), Floyd, co-defendant Wilson, and co-defendant Slack.  Tr. at 433, 438-439.  At Floyd's Plaza, Floyd passed out gear for the robbery such as police shirts, a bullet proof vest, masks, and guns.  Tr. at 435, 437, 438.  Floyd took charge of a Mossberg shotgun with a shortened barrel that co-defendant Slack recognized as belonging to Dixon.  Tr. at 435; Tr. at 438.  And Floyd gave a .44 magnum gun to co-defendant Wilson.  Tr. at 437.  Floyd could not figure out how to load the shotgun, so he called Dixon, who gave him directions on how to load it.  Tr. at 438-439.  While the men prepared for the robbery, Guyton ran through the details of the plan for the robbery, including that it was a robbery to steal cocaine.  Tr. at 433-434, 440, 458-459.  After Guyton had explained the robbery plan to the men at Floyd's Plaza, none of them withdrew from the conspiracy.  Tr. at 440, 490, 491.

When "Shawn" called and said it was time to meet to go to "Tony's" stash house, the men at Floyd's Plaza rode together in an SUV to meet "Shawn" and "Toby" at a Church's Chicken on Camp Creek Parkway.  Tr. at 122-123.  When they met at the Church's Chicken, Floyd reassured "Shawn" that despite Dixon's absence, "Shawn" would still get his cut of the cocaine after the robbery.  Tr. at

314.  Floyd also assured "Shawn" that all of the men in the crew were committed to doing the robbery.  Tr. at 315.  After that, a SWAT team arrested the Floyd, Slack, and Wilson.  Tr. at 315.  Dixon was arrested when he returned to the Atlanta area several days later.

### D. Dixon and Floyd's previous stash house robberies.

In the first undercover recording played at trial, Dixon directly stated that he had previously robbed an individual named Cook, and he explained his motivation for robbing Cook.  Guyton testified at trial that Cook was a high level cocaine trafficker in the Atlanta area at that time.  Tr. at 70.  Guyton also testified at trial that Dixon's statements about robbing Cook were what convinced Guyton that Dixon was actually a drug stash house robber.  These statements were later corroborated at trial by Slack, who testified that he had actually gone on a robbery with Dixon where they attempted to rob Cook.  Tr. at 395-400.  Notably, Slack testified that Dixon planned the previous robbery of Cook, that they were robbing Cook because he was a known drug dealer in Atlanta, and that Dixon knew Cook.  Tr. at 396.  Furthermore, Slack testified at trial about Dixon's violence during that robbery, including that Dixon repeatedly beat Cook on the head with a shotgun.  Tr. at 399.

Indeed, in the recordings played at trial, Dixon repeatedly emphasized that he was an experienced stash house robber.  He explained how he liked to conduct the robberies, he talked about the equipment he would provide, and he emphasized that he had an experienced team of robbers who would follow his lead during a robbery.  Slack also corroborated these statements through his

9

testimony at trial.  In addition to the Cook robbery in which Slack participated, Slack also testified at trial about two other stash house robberies that Dixon had told him about that Dixon and his team carried out.  Tr. at 419-423.  And Slack testified that during the same time frame that Dixon was plotting the robbery of "Tony" with the undercover ATF agents, Dixon was planning another robbery of a completely separate stash house in Atlanta.  Tr. at 416-418.  Slack testified that Dixon took both Slack and Floyd on surveillance rides of this other house in the weeks leading up to their arrest as preparation for robbing it.  *Id.*

Similarly, Floyd was captured on tape on the day of the robbery stating that he had previously participated in a robbery in which someone was killed.  Gov. Ex. 4.  Slack, who was close friends with Floyd for years prior to their arrest in this case, testified at trial about a previous stash house robbery that Floyd told him about.  Slack testified that Floyd told him that in approximately 2004 or 2005, he had broken into the house of a suspected drug dealer and attempted to rob the man at gun point.  But the man struggled against Floyd, and during the struggle, Floyd's gun went off, shooting the man in the neck or collarbone.  Tr. at 425-427.

## ARGUMENT AND AUTHORITY

Defendant Dixon has informed the Court and the government, through a series of four emails, that he intends to raise the issues of sentencing entrapment and sentencing factor manipulation at sentencing.  Defendants Dixon and Floyd have also both challenged the drug quantity attributed to them in the Pre-Sentence Investigation Report.  Accordingly, the government files this

Sentencing Memorandum to address the applicable law in the Eleventh Circuit on the issues of sentencing entrapment and sentencing factor manipulation.

**1. The Eleventh Circuit Does Not Recognize Sentencing Entrapment as a Defense.**

First, Dixon, through counsel, emailed the Court and counsel for the United States on March 6, 2014 that he intends to raise the issue of sentencing entrapment at his sentencing, based on the Ninth Circuit case of *United States v. Yuman-Hernandez*, 712 F.3d 471 (9th Cir. 2013).  But Dixon cannot prevail on this issue because sentencing entrapment is not a recognized defense in the Eleventh Circuit.  *See United States v. Sanchez*, 138 F.3d 1410, 1414 (11th Cir. 1998) ("[T]his Circuit has rejected sentence entrapment as a viable defense.").  *See also United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007) ("While our Circuit does not recognize sentencing entrapment as a viable defense, we do recognize the outrageous government conduct defense, and we have considered sentencing manipulation as a viable defense.").  Thus, the Court should reject Dixon's argument that the sentencing entrapment doctrine of the Ninth Circuit should apply to this case.[3]

---

[3] Of course, given Dixon's lengthy statements on tape during the investigation regarding his experience conducting stash house robberies, and his prior history of conducting stash house robberies as testified to by Slack, even under the Ninth Circuit's test for sentencing entrapment, Dixon would not qualify for sentencing entrapment.  *See Yuman-Hernandez*, 712 F.3d at 475 (9th Cir. 2012) (to show sentencing entrapment in a stash house sting operation, a defendant must show either "a lack of intent *or* lack of capability to deal in the quantity of drugs charged.").  Similarly, given Floyd's previous statements to Slack regarding the robbery in Goldsboro, North Carolina, Floyd also cannot avail himself of the

### 2. The Eleventh Circuit Has Held That Using a Large Quantity of Fictitious Drugs in a Reverse Sting Operation Does Not Constitute Sentencing Factor Manipulation.

Second, Dixon, again through an email from counsel, also notified the Court and counsel for the United States that he intends to raise a sentencing factor manipulation argument based on the Eleventh Circuit cases of *United States v. Ciszkowski* and *United States v. Sanchez*. It is the government's understanding that Dixon intends to argue that if the Court finds sentencing factor manipulation occurred in this case as to the drug quantity attributed to Dixon, then the Court should disregard the 10-year mandatory minimum term of imprisonment that the offense carries. Although the Eleventh Circuit recognizes sentencing manipulation as a viable defense, and has previously stated that if a court finds sentencing factor manipulation, no mandatory minimum applies as a result of that manipulation, *see Ciszkowski*, 492 F.3d at 1270, Dixon nonetheless cannot prevail on this issue because he cannot reach the "high" standard for showing sentencing factor manipulation. *See Ciszkowski*, 492 F.3d at 1271 ("The standard for sentencing factor manipulation is high, even in the circuits where it has been recognized as a viable defense to the application of a mandatory minimum.").

---

Ninth Circuit's sentencing entrapment defense. *See id.* (defendant's "ability to purchase any given amount of cocaine is not relevant. Instead, the predisposition-capability concerned here is that to conspire with others to take the amount of cocaine involved by force. His argument fails even if the question is construed as whether the lacked predisposition to *handle* a large amount of cocaine. He was involved as a member of a stick-up crew; there is no indication he would have been expected to deal or otherwise offload the cocaine by himself after the robbery.").

The Eleventh Circuit has flatly rejected the argument that the selection of a particular quantity of drugs in a sting operation constitutes sentencing factor manipulation. Indeed, in *Sanchez,* the Eleventh Circuit directly addressed this issue, and held that the government's selection of an amount of drugs to be stolen by defendants in a reverse sting operation – where, like in this case, the stash house to be robbed and the drugs to be stolen were all fictitious -- simply did not constitute sentencing factor manipulation. *United States v. Sanchez*, 138 F.3d 1410, 1414 (1998) ("The fact that the government's fictitious reverse sting operation involved a large quantity of drugs does not amount to the type of manipulative governmental conduct warranting a downward departure in sentencing.").

Since *Sanchez*, the Eleventh Circuit has repeatedly affirmed that holding. *See Cizkowski*, 492 F.3d at 1271 (citing *Sanchez* for the proposition that "government informant's selection of a fictitious amount of drugs to be stolen by defendants was not manipulation of the quantity"). *See also United States v. Daniels*, 345 Fed. Appx. 514, 522-523 (11th Cir. 2009) ("We have previously failed to find sentencing factor manipulation where the government (1) selected the age of a 'minor' victim for a sting operation, even though the selected age resulted in a guideline enhancement, (2) selected a fictitious amount of drugs to be stolen by the defendants, and (3) provided the defendant with a firearm with a silencer to use in the commission of an offense. In light of these prior cases, [defendant] has failed to show that ATF agents engaged in sentencing factor manipulation simply by stating that the two men guarding the stash house would be armed or

informing the defendants that the stash house contained at least 15 kilograms of cocaine.") (internal citations omitted); *United States v. Dames*, 2014 WL 591043 at *3, No. 12-12988 (11th Cir. Feb. 18, 2014) ("We have held that neither the use of a large drug quantity of drugs in a reverse sting operation nor the use of one type of drug over another drug, which caused a difference in sentence, constituted sentencing factor manipulation.").  Based on the Eleventh Circuit's precedent, Dixon and Floyd simply cannot show that the selection by the undercover agents of 25 kilograms of cocaine for the amount of cocaine located in the stash house constitutes sentencing factor manipulation. *See also United States v. Holland*, 503 Fed. Appx. 737, 746 (11th Cir. 2013) ("Here, [defendant's] argument that the government engaged in sentencing-factor manipulation by inventing the amount of cocaine is foreclosed by this court's holding in *Sanchez*.").

### 3.  There was no outrageous government misconduct in this case.

In order to show sentencing factor manipulation in the Eleventh Circuit, a defendant "must show that the government's conduct is sufficiently reprehensible by establishing that the government engaged in extraordinary misconduct."  *Daniels*, 345 Fed. Appx. at 522 (internal punctuation omitted). Here, even if Dixon and Floyd's sentencing manipulation argument were not squarely foreclosed by *Sanchez*, neither defendant can show extraordinary misconduct by the government to establish sentencing factor manipulation.

Dixon, again through an email from counsel, informed the Court and counsel for the United States on July 15, 2014 that he also intends to rely at sentencing on the reasoning contained in two Central District of California court orders, *United*

*States v. Hudson*, 2014 WL 960860 (C.D. Cal. 2014) and *United States v. Roberts*, CR 13-00751 (C.D. Cal. 2014).  Although Dixon has not explained how he intends to rely on those orders, given that both orders are dismissals of indictments against defendants based on the courts' finding outrageous government misconduct by the ATF in reverse sting operations, the government assumes that Dixon at least intends to use those orders to argue that this Court should find extraordinary misconduct in order to support his sentencing manipulation argument.

But, as with his sentencing entrapment argument, any argument by Dixon based on these Central District of California court orders must fail for two reasons.  First, both of those court orders are based on the applicable Ninth Circuit test for outrageous government misconduct, which is a different analysis than the Eleventh Circuit standard.  Second, both of those court orders are entirely distinguishable on their facts from this case.

In the Eleventh Circuit, the analysis for outrageous government conduct has been articulated as follows: "outrageous government conduct occurs when law enforcement obtains a conviction for conduct beyond the defendant's predisposition by employing methods that fail to comport with due process guarantees.  Under this standard, the conduct must be so outrageous that it is fundamentally unfair." *Ciszkowski*, 492 F.3d at 1270 (internal citations and punctuation omitted).  In evaluating a claim, "the totality of the circumstances must be considered with no single factor controlling.  The defense is to be invoked only in the rarest and most outrageous of circumstances." *United States v. Ofshe*, 817 F.2d 1508, 1516 (11th Cir. 1987).  Indeed, outrageous government

misconduct has been applied so rarely that its continued viability in the Eleventh Circuit has been questioned recently in the Northern District of Georgia. *See United States v. Guerrero*, 2:12-CR-022-RWS-JCF, 2013 WL 5530613 (N.D. Ga. May 9, 2013) report and recommendation adopted sub nom. *United States v. Honeycutt*, 2:12-CR-00022-RWS, 2013 WL 5530519 (N.D. Ga. Oct. 3, 2013) ("Within this Circuit more recently, in *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir.2011), the court explained that the Eleventh Circuit had 'never applied the outrageous government conduct defense and ha[d] discussed it only in dicta,' and pointed out that several other circuits 'have either rejected this defense completely' or 'have been sharply critical of the defense,' thus casting doubt on its continued viability.").

In contrast, the Ninth Circuit employs a six factor analysis to claims of government misconduct. *United States v. Hudson*, 2:13-CR-00126-ODW-3, 2014 WL 960860 (C.D. Cal. Mar. 10, 2014), reconsideration denied (Mar. 12, 2014). It was in applying those factors that both Central District of California courts in *Hudson* and *Roberts* found outrageous government misconduct in the cases before them. But that analysis has not been adopted by the Eleventh Circuit, and this Court should not adopt it now.

The application by both of the Central District of California courts of the Ninth Circuit's outrageous government conduct analysis is contrary to Eleventh Circuit authority. For instance, in *Roberts*, when analyzing the third, fourth, and fifth factors in the Ninth Circuit analysis, the court at length describes the law enforcement agent as engaging in a "fraud" by participating in an undercover

16

operation.  *Roberts*, CR 13-00751 at 7.  And in evaluating the sixth factor, the court in *Roberts* questioned the necessity of the ATF's engaging in stash house robbery sting operations at all.  *Roberts*, CR 13-00751 at 8.  The court in *Roberts* took its analysis of these factors as reasons to find outrageous government misconduct. Similarly, when evaluating the fifth factor of the Ninth Circuit analysis, the court in *Hudson* found that the undercover agent's statement that the guards at the fictional stash house would be armed was a factor weighing in favor of finding outrageous government misconduct.  *Hudson*, 2014 WL 960860 at 11.  But in contrast to those two district courts' apparent disapproval of stash house sting operations, the Eleventh Circuit has repeatedly approved government sting operations, stating that "[g]overnment created reverse sting operations are recognized and useful methods of law enforcement investigation."  *Cizkowski*, 492 F.3d at 1271.  *See also Sanchez*, 138 F.3d at 1413 ("Government infiltration of criminal activity is a recognized and permissible means of investigation . . . . Moreover, challenges to the 'reverse sting' method of police investigation have been rejected by this Court on numerous occasions.").

Indeed, in a sting operation case involving a fictional stash house, the Eleventh Circuit in an unpublished decision directly refused to find sentencing manipulation where ATF agents "stated that the two men guarding the stash house would be armed or inform[ed] the defendants that the stash house contained at least 15 kilograms of cocaine." *United States v. Daniels*, 345 Fed. Appx. 514, 523 (11th Cir. 2009).  *See also United States v. Sadinas*, 386 Fed. Appx. 927, 945 (11th Cir. 2010) ("The government agents who testified at trial stated

17

that they included elements of danger in the fictitious scenario in order to make the story realistic and believable.  Sting operations must be believable to be effective, and, as we have explained, government-created reverse sting operations are recognized and useful methods of law enforcement investigation.").

Therefore, the six-factor analysis used in the Ninth Circuit is not the applicable law in the Eleventh Circuit for evaluating claims of outrageous government misconduct, and thus the court orders in *Hudson* and *Roberts* are inapposite to this case.  Furthermore, the way in which the courts in *Hudson* and *Roberts* applied the Ninth Circuit's six-factor analysis to the facts of sting operations is directly contrary to case law in the Eleventh Circuit.

But even under the Ninth Circuit's analysis as applied by the courts in *Hudson* and *Roberts*, this Court should not find outrageous government misconduct or extraordinary government misconduct in this case because this case is factually distinct from the *Hudson* and *Roberts* cases.  Both the courts in *Hudson* and *Roberts* emphasized that defendants in those cases had no known history of committing stash house robberies before the ATF undercover operation.  *See Hudson*, 2014 WL 960860  at 7 (the defendant's previous "commercial robberies also bear little upon the fictitious stash-house scheme or the home invasions the ATF sought to eliminate."); *Roberts*, CR 13-00751 at 5-6 ("While the government has averred that the defendants are violent narco-traffickers, this is hard to countenance with a straight face. For instance, defendant Cortez had three prior misdemeanor convictions: driving with a suspended license, possession of under an ounce of

18

marijuana, and criminal threats. These offenses hardly arise to the level of violent 'recidivist career criminals' that the government argues.").  In contrast, in this case Dixon only came to the attention of the ATF after he had initiated the idea of robbing "Tony" and after he had described to Guyton a previous home invasion stash house robbery (*i.e.* the Glenn Cook robbery).  Similarly, Floyd, who was recruited into the conspiracy by Dixon, had previously told Slack that he had engaged in a violent armed home invasion-style stash house robbery in North Carolina.  And Slack testified at trial that he, Floyd, and Dixon, led by Dixon, were planning a completely separate home-invasion style stash house robbery of a different location in the weeks leading up to their arrest in the sting operation.  Thus, Dixon and Floyd's previous history of engaging in armed stash house robberies makes this case completely unlike the cases on which Dixon has indicated he will rely.  Finally, the fact that Floyd was not the original target of the ATF sting operation also does not constitute extraordinary misconduct as to him.  *United States v. Docampo*, 573 F.3d 1091, 1098 (11th Circ. 2009) ("That the sting operation involved a young adult who was not the original target does not amount to extraordinary misconduct by the government.").

**Conclusion**

Therefore, based on the authority and facts described above, this Court should reject the defendants' sentencing entrapment and sentencing factor manipulation arguments.


Respectfully submitted,

SALLY QUILLIAN YATES
*United States Attorney*


/s/ MARY L. WEBB
   *Assistant United States Attorney*
Georgia Bar No. 940420
Mary.webb@usdoj.gov


600 U.S. Courthouse   75 Spring Street SW   Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181

**Certificate of Service**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Steve Sadow

Akil Secret

William Morrison

Cyprian Tee Okonkwo

July 16, 2014

/s/ MARY L. WEBB

MARY L. WEBB

*Assistant United States Attorney*